UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOHN HICKMAN,

                           Plaintiff,

                -against-

BURLINGTON BIO-MEDICAL
CORPORATION, MICROPEL
CORPORATION, ATOMERGIC
CHEMETALS CORP. and AMEROL
CORP.,

                        Defendants.
-----------------------------------------------------------X

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

CV 04-5468

(Wexler, J.)

APPEARANCES:

    WOLFE & YUKELSON PLLC
    BY: BRUCE YUKELSON, ESQ.
    Attorneys for Plaintiff
    14 Vanderventer Avenue Suite 101
    Port Washington, New York 11050

    SILVERMAN PERLSTEIN & ACAMPORA LLP
    BY: ROBERT J. ANSELL, ESQ.
    Attorneys for Defendants
    100 Jericho Quadrangle Suite 300
    Jericho, New York 11753

WEXLER, District Judge

      This is a diversity action commenced by Plaintiff John Hickman ("Hickman" or "Plaintiff") to recover amounts allegedly due to him pursuant to a contract of employment. This case was tried before the court and the parties subsequently submitted their proposed findings of fact and conclusions of law. The court has considered those submissions and this constitutes the court's findings of fact and conclusions of law.

1

## FINDINGS OF FACT

A. <u>The Parties</u>

1. Plaintiff John Hickman ("Hickman") is a resident of the State of Massachusetts.

2. Defendants are Burlington Bio-Medical and Scientific Corporation ("Burlington"), Micropel Corporation ("Micropel"), Atomergic Chemetals Corp. ("Atomergic") and Amerol Corp. ("Amerol") (collectively the "Defendant Companies")

3. The Defendant Companies are related in the following manner.

4. Atomergic was incorporated in 1962. At the time of its incorporation, it was involved in the high-tech materials business for the aerospace and nuclear industries. The President and Chief Executive Officer of Atomergic was Mel Blum ("Blum"). Also involved in the ownership of Atomergic were Michael Roitberg ("Michael," also referred to at trial as "Mischa") and his son, Ben-Zion Roitberg ("Ben") (Michael and Ben-Zion Roitberg referred to collectively as the "Roitbergs").

5. Atomergic was the parent company for several other companies later acquired or formed by Blum and the Roitbergs. Those companies include Amerol and Burlington.

6. Atomergic was also the parent company of Micropel. Micropel was incorporated in January of 2002. At the time of its spin-off from Atomergic, Blum owned 50% of the company, Michael owned 10% and Ben owned 40%.

7. Prior to 1997, Hickman was employed by a company known as Ventrol.

8. Hickman first met Blum in the early 1990's. In 1997, Blum proposed that Hickman join Blum in his business. It was Blum's intent that Hickman become involved in the biocide division of Burlington. It was this division that would later be incorporated as Micropel.

9. Prior to the incorporation of Micropel, Blum was the President of the division. After its separate incorporation, Michael Roitberg became the president and Blum became chairman of the board.

B. <u>The 1997 Employment Agreement</u>

10. When Hickman joined Blum in 1997, the parties agreed upon a contract of employment dated May 1, 1997 (the "Agreement").

11. The parties to the Agreement were Hickman and Burlington. Hickman executed the Agreement on his own behalf and Blum executed the Agreement on behalf of Burlington.

12. Hickman's compensation under the Agreement was to consist of a base salary of not less than $60,000 as well as a bonus and profit sharing. Hickman's bonus was to consist of 1% the gross sales of products sold by Hickman. Certain of those products are listed in a schedule to the Agreement. Profit sharing under the Agreement was based upon Burlington's profits.

13. Section 1(d) of the Agreement provides for a "payout interest." This refers to the right to a cash payment that could be exercised by Hickman at any time during his employment by Burlington or within thirty days of his termination.

14. Section 1(e) of the Agreement provides for a cash payment to Hickman in the

event of a "change in control." It is this change in control provision that forms the basis for the bulk of Hickman's claims here.

15. The change in control provision allows Hickman, at his discretion and if he has not exercised his right to his payout interest, to a cash payment in an amount equal to 5% of Burlington's gross proceeds from a defined "change in control."

16. The Agreement sets forth three events that constitute a change in control. Relevant here is the subsection that defines a change in control as "a sale of all or substantially all of the assets" of Burlington. The exercise of the change in control provision is, according to the Agreement, to be communicated to Burlington within forty-five days of such change.

17. Section 2 of the Agreement provides that it shall be binding and inure to the benefit of Burlington "and any successor to or assignee" of Burlington, "and any such successor or assignee shall be deemed to be substituted" for Burlington under the provisions of the Agreement.

18. After signing the Agreement, Hickman began to work for Burlington and its biocide division (later separately incorporated) Micropel.

19. An August 1, 2001 resolution of the Board of Directors of Micropel appointed Hickman as the President of the Micropel division.

20. On January 28, 2002, Micropel was incorporated as a separate corporation.

C. The 2002 Sale to the Marquee Group

21. The Marquee Group, Ltd. ("Marquee") is a corporation owned by Dominick Sartorio ("Sartorio"). Marquee was formed to acquired shares of stock owned by

Blum and the Roitbergs. At the time of its formation, Mel Blum owned a 50% interest in Marquee.

22. On May 17, 2002, Marquee purchased all of the outstanding capital stock of Atomergic International, Ltd. and Burlington. This acquisition was accomplished through a stock purchase agreement (the "Marquee Stock Purchase Agreement").

23. As part of the Marquee Stock Purchase Agreement, Marquee also purchased the outstanding capital stock in Dragon Chemical Corp. and a limited liability interest in a company known as M&M Chemical LLC.

24. The Marquee Stock Purchase Agreement refers to the companies purchased as the "Companies." The lines of business of the Companies are described in an organizational chart that is part of the Marquee Stock Purchase Agreement. The description of the lines of business for the acquired companies includes Micropel, described as a "Burlington Spin-off." Micropel is also included in an organizational chart made a part of the Marquee Stock Purchase Agreement.

25. Micropel is not referred to in the Marquee Stock Purchase Agreement as a company whose capital stock was purchased because, at the time of the 2002 acquisition by Marquee, Micropel was a separate corporation but had not yet issued any shares of stock.

26. The court finds that on May 17, 2002, Marquee acquired Micropel as part of the Marquee Stock Purchase Agreement.

27. The Marquee Stock Purchase Agreement acknowledges the existence of certain contracts to which the companies being acquired were bound. In particular,

Section 2.19 of the Marquee Stock Purchase Agreement refers to contracts with payments "expected or likely to exceed $25,000 per year . . . to which [the acquired companies were] a party to or by which their respective Assets and Properties [were] bound." Contracts falling within this definition are listed in the Disclosure Schedule Section 2.19 of the Marquee Stock Purchase Agreement.

28. Disclosure Schedule Section 2.19 of the Marquee Stock Purchase Agreement lists the "John Hickman employment arrangement" as a contract to be disclosed under the Marquee Stock Purchase Agreement.

29. The court finds that the "John Hickman employment arrangement" referred to in the Marquee Stock Purchase Agreement is the Agreement.

30. Hickman was aware of the Marquee Stock Purchase Agreement prior to its consummation on May 17, 2002. Hickman was involved in acquainting the principals of Marquee, including Sartorio, with the business of Micropel.

31. Prior to the execution of the Marquee Stock Purchase Agreement, Hickman discussed, with Sartorio and other individuals with the Marquee Group, the future of his employment at Micropel after the potential acquisition.

32. The principals of Marquee, including Sartorio, met with Hickman and expressed an interest in having Hickman remain with Micropel after the acquisition and to continue to grow the business of Micropel with Marquee.

33. Sartorio acknowledged, at trial, several conversations with Hickman and corroborated Hickman's testimony regarding Marquee's interest in having Hickman stay with Micropel after the acquisition. Sartorio testified that he was

not familiar with Hickman's compensation. The court finds the testimony regarding Sartorio's lack of knowledge as to Hickman's compensation to lack credibility.

34. Based upon his discussions with the principals of Marquee, including Sartorio, Hickman agreed to stay on at Micropel after execution of the 2002 Marquee Stock Purchase Agreement. Hickman demanded neither his payout interest nor a percentage of the proceeds of the 2002 sale of stock to Marquee in connection with the change in control provision of the Agreement.

D. The 2004 Sale to Troy

35. On April 14, 2004, the assets of Micropel were sold by Marquee to Troy Chemical ("Troy") for the sum of $6,297,000, plus an assumption of liabilities in the amount of $566,079 (the "2004 Sale"). That sale was accomplished through an asset purchase agreement pursuant to which Troy purchased the assets of a company known as "M2 Technologies," whose parent company was Micropel.

36. The 2004 Sale transferred substantially the entire business of Micropel to Troy.

37. Hickman knew of the 2004 Sale prior to the date of the acquisition. Similar to the 2002 sale to Marquee, Hickman was involved in acquainting the potential buyers with the business of Micropel.

38. After the 2004 Sale, Hickman became an employee of Troy.

39. Prior to, and to facilitate his employment with Troy, Hickman was required to execute an agreement entitled "Termination of Employment, Patent and Confidential Information Agreement," (the "Termination Agreement").

7

40. The Termination Agreement is dated April 14, 2004 and was entered into by and between Hickman and Atomergic, Burlington, American Roland, Atrament, Inc. Atomgraph Corp. and "all corporations and other business entities now or hereinafter controlled directly or indirectly controlled by the aforesaid corporations with an address at 71 Carolyn Blvd., Farmingdale, New York 11735."

41. 71 Carolyn Blvd., Farmingdale, New York 11735 was the location of Micropel prior to the 2004 Sale.

42. The Termination Agreement recognizes that Hickman was bound to an "Employment, Patent and Confidentiality Agreement dated July 3, 1997 (the "Confidentiality Agreement"). Although referred to as an "employment" agreement, the Confidentiality Agreement is not the 1997 Agreement, detailed above, but is a different contract that addresses Hickman's obligations with respect to inventions and confidential information. The Confidentiality Agreement also contains an agreement by Hickman not to compete after termination.

43. The Confidentiality Agreement recognizes the existence of the Agreement and states that "[o]ther terms of [Hickman's] employment, benefits and compensation are set forth in the employment 'Agreement.'"

44. In addition to terminating the Confidentiality Agreement, the Termination Agreement states that the "Company" (defined in the Termination Agreement to include all companies located at 71 Carolyn Blvd., Farmingdale, New York

11735) "shall pay to [Hickman] all compensation, benefits and the like [Hickman] is entitled to by virtue of the Company's past business practices through the date] of the Termination Agreement.

45. Hickman is currently employed by an entity known as "Micropel LLC," which is a part of Troy.

E. Hickman's Demands For Change in Control Payment

46. After the 2004 Sale, Hickman had discussions with Sartorio and others at Micropel concerning the exercise of his right to a percentage of the sale pursuant to the change in control provision of the Agreement. Hickman testified to these conversations and introduced e-mails memorializing his demands.

47. Sartorio knew of Hickman's demand to the change in control payment and acknowledged Hickman's right to that payment. This is evidenced by Hickman's credible testimony as well as the parties' discussions concerning the structure of payments in connection with Hickman's 401(k) retirement plan.

48. Sartorio's specific acknowledgment of such discussions appears in an e-mail sent by Sartorio to Hickman dated April 19, 2004. That e-mail states that Hickman's 5% "will be minus the 401(k) Max out."

49. On May 27, 2004, Hickman wrote to Sartorio requesting 5% of the 2004 Sale, pursuant to the change in control provision of the Agreement. The letter characterizes the request as "formal notification" under Section 1(e) of the Agreement.

50. Hickman made the request again, in a follow-up e-mail addressed to Sartorio and

Roger Brown (the new president of Micropel) dated May 28, 2004.

51. Hickman testified credibly as to oral conversations with Sartorio and Roger Brown regarding his alleged right to a change of control payment in connection with the 2004 Sale.

52. Hickman testified that in May of 2004, Sartorio indicated that the change in control payment was forthcoming. Hickman testified that Brown was continually vague when referring to the change in control payment.

53. Hickman never received any payment as a consequence of the 2004 Sale and pursuant to the change in control provision of the Agreement.

F. Commissions

54. In addition to base salary, Hickman received a draw against his commissions due in the amount of $26,000 per year. This draw was paid to Hickman in bi-weekly installments of $1,000.

55. All checks paid to Hickman were checks in the name of Atomergic, and not in the name of Micropel.

56. Hickman testified that his commission structured varied, depending upon the product sold and his participation in the sale, from 1% to 2.5%.

57. Hickman testified that he first began receiving commissions of 2% as a result of a commission change that took effect in early 2000. He also stated that as president of Micropel he also received .5% commission on all sales of the company.

58. Portions of Roger Brown's deposition were read at trial. Brown testified that Hickman's commissions on sales ranged from 0 - 2%, depending upon the

account.

59. Brown's testimony regarding the range of Hickman's commissions is corroborated in an e-mail that Brown sent to John Vitolo at Troy. The e-mail to Vitolo was sent by Brown in response to Vitolo's question regarding Hickman's compensation. In that e-mail, dated April 4, 2004, Brown states that Hickman received a base salary of $110,000 plus commissions ranging from 0-2% "sales revenue based on individual accounts and based on the type of product and profitability level." This e-mail also confirmed that Hickman received $26,000 per year as a draw against his commission

60. Blum testified that Hickman received .5% of the sales by his division as the president of that division. Hickman also received an additional 1% on sales he initiated and 1% of products sold by salespeople in his division. It was thus Blum's testimony that Hickman's commission ranged between .5 and 2.5%.

61. Hickman introduced at trial documentary evidence of unpaid commissions. Those documents detail sales made, amounts billed and the identity of the salesperson involved in the sale. Specifically, Hickman introduced documents indicating commissions that he earned for each quarter of fiscal years 2001-2003 and through the second quarter of 2004.

62. Hickman's documentary evidence indicates that of earned commissions in the amount of $224,169.29, there remains due to him $155,841.

## CONCLUSIONS OF LAW

I. <u>Hickman's Claims Claim to a Change in Control Payment</u>

63. A corporation that acquires the assets of another corporation does not automatically become liable for the obligations of its predecessor. <u>Ulanet v. D'artagnan, Inc.</u>, 170 F. Supp.2d 356, 358 (E.D.N.Y. 2001).

64. Liability is assumed only if one of the following four criteria is met: (1) the successor corporation either expressly or impliedly agrees to an assumption of liabilities; (2) the transaction is a de facto merger; (3) the successor is a mere continuation of the predecessor or (4) the transaction is fraudulent. <u>Id</u>.

65. Factors to consider when determining whether a de factor merger has occurred include whether there is a "continuity of ownership, assumption of liabilities ordinarily necessary for the uninterrupted continuation of the business, continuity of management, personnel, physical location, assets and general business operations." <u>Id</u>.

66. Based upon the findings above, the court holds that Defendant Micropel became a successor to the Agreement and bound to its terms in 2002 when Marquee purchased the assets of the companies referred to in the Marquee Stock Purchase Agreement. The express statements of the principals of the Marquee Group, including those of Sartorio, resulted in the assumption of the Agreement by Micropel.

67. The court further holds that the remaining Defendants, other than Micropel, are also liable to Hickman for the change in control payment by virtue of the

12

Termination Agreement. The Termination Agreement is signed by Sartorio, and binds all "corporations and other business entities now or hereinafter controlled directly or indirectly controlled by" the Defendants, to pay to Hickman all "compensation benefits and the like" to which Hickman was entitled as a result of past business practices through the date of the Termination Agreement.

68. The court rejects the legal conclusion, advanced by Defendants, that the 2002 acquisition by Marquee extinguished the Agreement. Instead, the court holds that the actions of Sartorio and Marquee, as well as the express terms of the Marquee Stock Purchase Agreement, acknowledging the Agreement, constituted an express assumption and continuation of the Agreement.

69. Even if the 2002 acquisition by the Marquee Group constituted a "change in control" pursuant to the Agreement, Hickman's decision not to exercise his right to a change in control payment at that time did not terminate the Agreement or his right to exercise his right to payment upon a later change in control. That change in control took place upon the 2004 Sale.

70. Hickman properly exercise his right to request a change in control payment, pursuant to the Agreement, after the 2004 Sale to Troy. Based upon the sale price of Micropel to Troy of $6,863,079.00, Hickman is entitled to $343,153.95.

II. Hickman's Claims for Commissions

71. Hickman alleges that between January of 2001 and April of 2004, he became entitled to commissions in the amount of $224,169.29, of which only $68,000 has been paid.

13

72. Defendants are bound to payment of the commissions for the same reasons stated above that they are bound to pay the change in control payment to Hickman.

73. Hickman is entitled to payment of commissions in the amount of $155,841.29.

## CONCLUSION

74. The Court finds in favor of Plaintiff on his claim for a change in control payment in the amount of $343,153.95 and for unpaid commissions in the amount of $155,841.29 for a total of $498,995.24. Plaintiff is to submit a judgment, on notice, in accord with the findings and conclusions herein within two weeks of the date of this order.

SO ORDERED.

                                                LEONARD D. WEXLER
                                                UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
        November   , 2006